UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**BARBARA C. KASPER**,                                    Civil Case No. 1:11-3118-KI

     Plaintiff,                              OPINION AND ORDER

  v.

**MICHAEL J. ASTRUE, Commissioner**
**Social Security Administration**,

     Defendant.

   Arthur W. Stevens III
   Black, Chapman, Webber & Stevens
   221 Stewart Ave., Ste. 209
   Medford, OR 97501

     Attorney for Plaintiff

   S. Amanda Marshall
   United States Attorney
   District of Oregon
   Adrian L. Brown
   Assistant United States Attorney

Page 1 - OPINION AND ORDER

1000 SW Third Ave., Ste 600
Portland, OR 97204-2902

David Morado
Regional Chief Counsel, Region X, Seattle
Scott T. Morris
Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
1301 Young Street, Ste A-702
Dallas, TX 75202

       Attorneys for Defendant

KING, Judge:

Plaintiff Barbara Kasper brings this action pursuant to section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for disability insurance benefits ("DIB").

I affirm the decision of the Commissioner.

## BACKGROUND

Kasper filed applications for DIB on July 15, 2008 and November 4, 2008, alleging

disability beginning June 30, 2003. The applications were denied initially and upon

reconsideration. After a timely request for a hearing, Kasper, represented by counsel, appeared

and testified before an Administrative Law Judge ("ALJ") on June 7, 2010.

On July 16, 2010, the ALJ issued a decision finding Kasper was not disabled within the

meaning of the Act and therefore not entitled to benefits. This decision became the final decision

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on

July 20, 2011.

Page 2 - OPINION AND ORDER

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which

significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005).  Substantial evidence is more than a "mere scintilla" of the evidence but less than

a preponderance. Id. "[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision." Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ found Kasper's date last insured was September 30, 2003. Accordingly, Kasper was required to demonstrate entitlement to disability prior to that date to receive DIB benefits. Kasper asserted an inability to work due to pericarditis[1] and Sjogren's disease[2] beginning June 30, 2003. She conceded she continued to work several part-time jobs until December 31, 2006.

The ALJ concluded, after reviewing the medical record, considering Kasper's testimony, and reviewing the lay witness reports from four people who knew Kasper in 2003, that Kasper was not suffering from any medically determinable impairment through her date last insured.

## FACTS

Kasper, who was 47 at the time of the hearing, alleges disability from June 30, 2003. She stopped working from 1995 to 1998 when she adopted her children. She last worked full-time in 2001 as a medical assistant. Before she permanently stopped all work on December 31, 2006, she held several part-time jobs before, during and after her alleged onset date of disability. She

---

[1]Pericarditis means inflammation of the conical sac of membrane enclosing the heart. Pericarditis Definition, NIH Medical Dictionary, http://www.merriam-webster.com/medlineplus/pericarditis (last visited Sept. 4, 2012).

[2]Sjogren's syndrome is "a chronic inflammatory autoimmune disease that affects especially older women, that is characterized by dryness of mucous membranes especially of the eyes and mouth and by infiltration of the affected tissues by lymphocytes, and that is often associated with rheumatoid arthritis[.]" Sjogren's Syndrome Definition, NIH Medical Dictionary, http://www.merriam-webster.com/medlineplus/Sjogren's (last visited Sept. 4, 2012).

cleaned someone else's house every three months or so, sometimes once a month.  She also put labels on envelopes for three consecutive days every three months or so.  She taught piano lessons.  She drove her two children and another neighbor to school every morning.

Kasper believes her current, serious shortness of breath, pain, and weakness began before her date last insured when she underwent right breast major ductal surgery on June 6, 2003 and began a prescription of Tamoxifen on August 22.  After her date last insured, on December 10, she reported bruises, fatigue and trouble sleeping to her surgeon, Jason A. Park, M.D.  At that time, Dr. Park replaced the Tamoxifen with Arimidex.  On January 23 and July 23, 2004, Kasper reported tolerating the Arimidex well.  Dr. Park discontinued the Arimidex on November 5 when Kasper complained of "bad aches" and feeling sick, and he confirmed her liver function studies were off.  Tr. 376.  She reported doing well on January 25, 2005, but complained of myalgias in May.  She questioned whether the symptoms were residual effects from the Arimidex.  Dr. Park recommended a rheumatology work-up given Kaspar's sister's history of rheumatoid arthritis. Dr. Park's notes do not reference any complaints of pain during a November 2005 visit or a January 2006 visit.  On May 31, 2006, he noted shortness of breath, Sjogren's, and the involvement of a rheumatologist as a "separate issue" from a follow-up on the major ductal excision.  Tr. 373.

Dr. Park's November 23, 2009 letter summarizes his care of Kasper:

Ms. Kasper was referred to my care by Dr. Ikeda in 2003.  Breast surgery was performed and she was healing well when examined post operatively in June 2003.  When she returned in August 2003 Barbara was started on Tamoxifen therapy, the risks and benefits were discussed in detail and a prescription was given at that time.  She then came to see me in December and for the first time had complaints of bruising, fatigue, and altered sleep patterns.  These symptoms

were discussed at length at that time, and it was decided to discontinue the Tamoxifen and do a trial period of Arimidex.

Ms. Kasper was followed regularly after her breast surgery, and seen about every six months. In 2004 and 2005 she complained of ongoing myalgias and/or arthralgias and generally feeling sick. Then in 2006 she reported episodes of E.R. visits for shortness of breath, as well as ongoing care with a rheumatologist. In 2007 she was under the care of a pulmonologist and a cardiologist for continued [shortness of breath] issues. I left private practice early in 2008, and the patient transferred her care.

Tr. 570.

Richard Ikeda, M.D., confirmed from billing records that he had treated Kasper beginning February 8, 2002 for back pain and sinusitis. He treated her in 2003 and 2004 for dizziness, a breast mass, trigger finger, and hyperlipidema. She was diagnosed with fibroymyalgia on November 16, 2004 and lethargy on December 16, 2004. The only medical records from this time reflect a November 2003 visit to Dr. Ikeda's office during which Kasper reported bruising–but not fatigue–from the Tamoxifen. The records also reflect her call to Dr. Ikeda's office on March 2004 to report that her surgeon switched her from Tamoxifen to Arimidex; "pt wants to notify that only." Tr. 394.

Kasper was confined to a wheelchair for over a year beginning in 2007. When she moved to Medford, she established care with Philipp Olshausen, M.D., PhD., who prescribed oxygen for her in June 2008 to help her at the higher elevation. He subsequently prescribed a wheelchair for Kasper on November 25, 2008.

Lawrence Levin, M.D., a rheumatologist, began treating Kasper in June of 2008. She reported that she had not felt well since 2003, after starting Tamoxifen. "After off these drugs, one year later, she was pain free but only for a few weeks." Tr. 427. The onset of her chest pain

and shortness of breath occurred in May of 2006.  Dr. Levin referred Kasper for a pulmonary

consultation with John C. Ordal, M.D., in August of 2008.  Dr. Ordal reported that Kasper's

muscle weakness and arthralgias began "sometime after" stopping the Arimidex prescription.

On May 1, 2009, Dr. Olshausen faxed a letter to the Social Security Administration as

follows:

> I am Mrs. Kasper's primary care physician and am hereby certifying that she is
> disabled for medical reasons.
>
> Mrs. Kasper experiences chronic pain due to one of her medical conditions and
> requires numerous medications to control this reasonably well.  The medications
> in themselves prevent her from pursuing any form of work at this point or
> schooling and certainly the pain limits her in the same way.  She is dependent on
> supplemental oxygen around the clock which again limits her activity level
> considerably even just in the home environment without even being able to
> consider the work environment.

Tr. 489.

Doctors at the Mayo Clinic evaluated Kasper in 2009.  After several weeks of testing, the

diagnoses were fibroymyalgia and chronic pain syndrome.

Kasper testified she went to Disneyland twice after she began the Tamoxifen.  One of

those times might have been in 2003.  The later time, probably in 2007, she was in a wheelchair.

She subsequently sent a letter to the ALJ to clarify her testimony.  She checked and confirmed

that she and her family visited Disneyland/California attractions during her children's fall break

in 2003, 2004, and 2006.

In her testimony, she agreed that the acute onset date for her symptoms was not until

2006.  Kasper described her experience with Tamoxifen as follows:

> [W]hen I went on the Tamoxifen the symptoms that presented at that time were
> the fatigue and the stiffness, and the weakness, a real muscle weakness.  And I

Page 8 - OPINION AND ORDER

remember some of the –one of the first things, it felt like my feet were like a, a
clod, like a –like heavy like.  When I walked they felt like they were just stumps.
And, and the, the aches that presented as time went on, the, the pain.  And that's,
that's the thing that has been consistent.

Tr. 48.

## DISCUSSION

I.    Application of SSR 83-20 to Determine Remote Onset Date

Kasper first takes issue with the ALJ's application of SSR 83-20, which is invoked when
evaluating a remote onset date.  She believes the ALJ should have consulted with a medical
expert.

A medically determinable impairment must be established through signs, symptoms, and
medically acceptable clinical or laboratory findings but under no circumstances can be
established through symptoms, namely the individual's own perception of the impact of the
impairment, alone.  SSR 96-4p; Ukolov v. Barnhart, 420 F.3d 1002, 1005 (9th Cir. 2005).

The ALJ reviewed the medical evidence, set forth above, noting that Kasper had surgery
in June 2003, started the Tamoxifen in August, reported only bruising in November and no other
adverse symptoms, discontinued the Tamoxifen in December, reported "doing well" on the
Arimidex in January, March, and July of 2004, and did not complain of any significant symptoms
again until November 2004.  The ALJ concluded:

> While the undersigned recognizes that the claimant has experienced severe
> limitations since the acute onset of symptoms in May 2006, there is no objective
> evidence to support that she had an underlying, as of yet unidentified medically
> determinable impairment that could cause her alleged symptoms and limitations.

Tr. 22.

Page 9 - OPINION AND ORDER

The ALJ also addressed the factors set forth in SSR 83-20 requiring the ALJ to consider

Kasper's allegations, work history, and medical evidence. The rule explains, in relevant part:

> Determining the proper onset date is particularly difficult, when for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process. . . . How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.

SSR 83-20.

The ALJ found the medical records were sufficient. He noted Kasper did not complain

about an adverse reaction to Tamoxifen until December 2003, three months after her date last

insured, and no medical provider had connected her symptoms to that prescription. The ALJ also

referenced the medical records of Dr. Levin, Dr. Ordal, and Dr. Ikeda, none of which supported a

medically determinable impairment prior to Kasper's date last insured of September 30, 2003.

Kasper contends Dr. Ikeda's letter, summarizing Kasper's history based on billing records

only, supports the need for a medical expert to identify the onset date of her disability. The ALJ,

however, relying on both Dr. Ikeda's letter and his chart notes from the relevant time, concluded

nothing supported a finding that Kasper had a medically determinable impairment prior to the

expiration of her date last insured. Indeed, Dr. Ikeda's letter was quite comprehensive,

identifying the fibromyalgia diagnosis as occurring in November 2004. His report was consistent

with Dr. Park's medical records when Kasper complained of "bad aches" in November 2004.

Kasper did not report to Dr. Park any significant problems with the Tamoxifen until December

2003, and she reported only bruising to Dr. Ikeda in November 2003. When she replaced the

Tamoxifen with Arimidex she told Dr. Park she was doing well in January 2004, and made no complaints to Dr. Ikeda in a call on March 15, and reported to Dr. Park she was doing well in July. The medical records, which are more than adequate, do not indicate that Kasper experienced any symptoms related to her disabling condition prior to September 30, 2003, and reflected that she was doing well until November of the following year. As a result, there was no need for the ALJ to call on the expertise of a medical expert.

Kasper points to the Mayo Clinic records in which she repeatedly linked her symptoms to her Tamoxifen prescription. Although the doctors repeated her allegations, none of them endorsed her view. In fact, one of the doctors rejected a connection between the Tamoxifen and the pericardial inflammation. Tr. 549. Dr. Park himself considered her shortness of breath, Sjogren's, and rheumatological issues as "separate" from her ductal excision and treatment. Tr. 373. In any event, Kasper's belief that her symptoms were related to her prescription for Tamoxifen are not supported by the medical evidence set forth above.

Substantial evidence supports the ALJ's determination that the medical evidence clearly established Kasper did not have a medically severe impairment or combination of impairments prior to her date last insured. See also SSR 83-20 ("the established onset date must be fixed based on the facts and can never be inconsistent with the medical evidence of record").

II.    Medical Evidence

Kasper devotes the bulk of her brief to her SSR 83-20 argument. She does, however, assign as error the ALJ's treatment of her physicians' opinions, and argues the ALJ substituted his opinion for Kasper's doctors' opinions.

Page 11 - OPINION AND ORDER

The ALJ found that Dr. Levin, Dr. Ordal, and Dr. Ikeda's records and statements "support the finding that the claimant did not have a medically determinable impairment prior to the expiration of her date last insured." Tr. 22. Additionally, the ALJ gave no weight to Dr. Olshausen's opinion because he did not treat or examine Kasper during the relevant time, did not identify a medical condition, and gave no functional limitations.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. Id. (treating physician); Widmark v. Barnhart, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. Orn, 495 F.3d at 632; Widmark, 454 F.3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. Widmark, 454 F.3d at 1066 n.2.

First of all, none of the physicians related Kasper's symptoms to her use of Tamoxifen in the fall of 2003. Additionally, only Dr. Ikeda and Dr. Park treated Kasper during the relevant time, and their medical records reflect a very short time when Kasper experienced side effects from the Tamoxifen. She did not report any symptoms through most of 2004. Additionally, the ALJ gave clear and convincing reasons for finding Dr. Olshausen's opinion entitled to no weight.

Page 12 - OPINION AND ORDER

He did not treat or examine Kasper during the relevant time, did not identify a medical condition, and did not offer any functional limitations in his letter. Batson, 359 F.3d at 1195 (an ALJ is not required to accept the opinion of a physician, even a treating physician, if the opinion is "brief, conclusory, and inadequately supported by clinical findings"). The ALJ did not err.

III.    Kasper's Credibility

Again, Kasper devoted the bulk of her brief to her SSR 83-20 argument, but does assign as error the ALJ's treatment of her testimony.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. Id. The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. Id. "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).

Although the ALJ cannot reject subjective pain testimony solely because it was not fully corroborated by objective medical evidence, medical evidence is still a relevant factor in determining the severity of the pain and its disabling effects.  Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).  Here, the medical evidence reflects Kasper did not complain about adverse side effects from Tamoxifen until December 2003, three months after her date last insured.  She replaced the Tamoxifen with Arimidex and reported doing well for most of 2004, until she complained of aches in November 2004.  If her fatigue, weakness and pain were as serious as she remembers it now, one would expect her to have sought advice and treatment from her medical providers well before December 2003.  See Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (unexplained failure to seek treatment is a credibility factor).

In addition, the ALJ noted Kasper continued to work several part-time jobs three years past her alleged onset date, she visited Disneyland/California theme parks three times from 2003 to 2006, and she was the primary care giver for her two energetic children during this time. Finally, the ALJ concluded, "Given the greater than five-year gap between alleged onset and actual application, it is reasonable to presume that the claimant's memory of specific dates could be slightly less than accurate."  Tr. 23.  The ALJ gave specific reasons, supported by substantial evidence, for finding Kasper's alleged onset date occurred after her date last insured.  Id. (daily activities a credibility issue; if ALJ's finding is supported by substantial evidence, court may not second guess).  The ALJ did not err.

IV.    Lay Witness Statements

Finally, Kasper assigns as error the ALJ's treatment of her lay witness statements.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must

Page 14 - OPINION AND ORDER

take into account unless he gives reasons for the rejection that are germane to each witness.

Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006). A medical diagnosis,
however, is beyond the competence of lay witnesses. Nguyen v. Chater, 100 F.3d 1462, 1467 (9th
Cir. 1996).

        Here, the medical evidence reflects Kasper did not complain about adverse side effects
from Tamoxifen until December 2003, three months after her date last insured. She replaced the
Tamoxifen with Arimidex and reported doing well for most of 2004, until she complained of
aches in November 2004. Accordingly, although the lay witness statements from Amanda
Lesher, E. Catherine Eldred, the Mocans, and Kasper's sister-in-law were detailed, it was
reasonable for the ALJ to note the medical evidence "clearly contradict[ed]" Kasper's alleged
onset date, making the statements irrelevant. Tr. 23. See SSR 83-20 (if medical evidence is
sufficient to support a particular onset date, no need to turn to third-party evidence); 42 U.S.C. §
423(d)(3) (existence of impairment must be demonstrated "by medically acceptable clinical and
laboratory diagnostic techniques").

        In any event, to the extent he was required to give germane reasons for finding the lay
witness statements unpersuasive, the ALJ found the six-year gap between the events and the
statements made the lay witness reports questionable. Additionally, he noted inconsistencies in
the statements; for example, the Mocans reported Kasper could not travel during this time, but
Kasper admitted to taking three family vacations. The ALJ did not err.

///

///

Page 15 - OPINION AND ORDER

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards.  For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this _____6th_____ day of September, 2012.


       _/s/ Garr M. King_____

Garr M. King
United States District Judge